**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**JANE DOE,**

        **Plaintiff,**

-vs-                                          Case No. 6:05-cv-259-Orl-31DAB

**EDWIN R. MANN, CITY OF ORLANDO,**
**and JOHN SMITH, unknown supervisor or**
**Supervisors at the Orlando Police**
**Department,**

        **Defendants.**

_____

## ORDER

This matter comes before the Court on a Motion for Summary Judgment (Doc. 94) filed by the City of Orlando (the "City") and Plaintiff's response thereto (Doc. 141). Plaintiff, Jane Doe ("Doe"), asserts claims against the City under 42 U.S.C. § 1983 (Count II) for violations of her federal constitutional rights and under Florida state law (Count V) for the negligent hiring, supervision and retention of Edwin Mann ("Mann"), a sex crimes detective employed by the Orlando Police Department ("OPD"), arising from a sexual relationship between Doe, as a 14 year-old girl, and Mann.

**I. Background**

Doe met Mann while both were members of the East Orlando Baptist Church (the "Church"). (Doe Depo. at 14-15). Mann was a deacon at the Church and his duties included working on the welcoming committee, supervising retreats, and conducting Sunday school classes for teens and college-age adults. (Doe Depo. at 15-16). Doe first became acquainted with Mann

because she was dating his son. (Doe Depo. at 14-15). Mann is married and has three children, and his family would often spend recreational time with Doe's family. (Mann Depo. dated August 18, 2005, at 13-14, 21 and 27).

In September of 2000, Doe stayed home from school on several occasions because she had been in and out of the hospital due to chest pains, which she believes were the result of anxiety attacks. (Doe Depo. at 20-21). During this time, Mann would come to her house and check on Doe while she was alone in the afternoons. (Doe Depo. at 20-21; Christine Vickers Depo. at 45). While he was there he began kissing Doe. (Doe Depo. at 20). On October 19, 2000, Mann had sexual intercourse with Doe in her home. (Doe Depo. at 22).

Doe's mother, Christine Vickers ("Mrs. Vickers"), became aware of the incident the next day when she read a letter that Mann had written to Doe. (Doe Depo. at 24-25; Christine Vickers Depo. at 16-17). Doe's mother confronted Mann that same day, at his home. Mann was in tears and explained to Mrs. Vickers that he had made a mistake and that it would never happen again. (Christine Vickers Depo. at 20).

When Mrs. Vickers arrived home from confronting Mann, she told Earl Ray Vickers ("Mr. Vickers"), her husband and Doe's step-father, about the incident. (Christine Vickers Depo. at 21). Mr. Vickers said that he was going to call the police but Mrs. Vickers told him not to. (Christine Vickers Depo. at 21). Mrs. Vickers explains that she did this because the letter from Mann to Doe talked about the two of them disappearing, and she was afraid that if she called the police she would lose her daughter. (Christine Vickers Depo. at 21). Mrs. Vickers also said that Doe had begged her not to call the police. (Christine Vickers Depo. at 18).

On October 21, 2000, Mr. and Mrs. Vickers, Doe and Mann met at Doe's house to discuss the incident. (Christine Vickers Depo. at 37). Again, Mann was very apologetic and stated that he loved Doe's family. (Christine Vickers Depo. at 37). Mr. and Mrs. Vickers told Mann that if it ever happened again they would report him. (Earl Ray Vickers Depo. at 13). Mann told them that if they reported this to the police they could "get in trouble. Be arrested. The kids would be taken away." (Earl Ray Vickers Depo. at 18). After this, Mr. and Mrs. Vickers attempted to keep Mann and Doe from seeing each other without supervision. (Earl Ray Vickers Depo. at 14, 18). However, Doe and Mann continued to meet in secret and had intercourse at least 14 more times. (Doe Depo. at 23, 25-26). Doe recalls having sex with Mann at her home, at Mann's home and in Mann's car. (Doe Depo. at 23, 25-26).

On April 2, 2001, Mann confided in one of his co-workers, Detective George Duke ("Duke"), about his affair with Doe. (Duke Depo. at 32-34). Duke reported Mann to the Florida Department of Law Enforcement ("FDLE") the next day, and shortly thereafter Mann was arrested and resigned from the OPD. Mann pled guilty to criminal charges and was sentenced to twenty-six years in prison.

## II. Standard of Review

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929

F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Svc., Inc.*, 252 F. Supp. 2d 1347, 1352 (M.D. Fla. 2003).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id*. at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp*., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

"Courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party . . . [e]ven though the facts accepted at the summary judgment stage of the proceedings may not be the actual facts of the case." *Davis v. Williams,* 451 F.3d 759, 763 (11th Cir. 2006) (internal citations and quotations omitted). The Court is not, however, required to accept all of the nonmovant's factual characterizations and legal arguments. *Beal*, 20 F.3d at 458-59. If material issues of fact exist, the Court must not decide them, but rather, must deny the motion and proceed to trial. *Herzog v. Castle Rock Entertainment,* 193 F.3d 1241, 1246 (11th Cir. 1999).

**III. Legal Analysis**

*A) 42 U.S.C. § 1983*

Doe brings a claim against the City under 42 U.S.C. § 1983 ("§ 1983") for violations of her constitutional rights. The City contends that Plaintiff has failed to show that the sexual misconduct of Mann was done pursuant to an official policy or practice of OPD or that it took place "under color of state law", which are essential elements of her claim under § 1983.

**1. Under Color of State Law**

To prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law. *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state or when he abuses the position given to him by the State. *Id.* The Eleventh Circuit "has previously recognized that under certain circumstances, a rape of a person by a state actor or official could violate the Constitution and serve as the basis for a suit under § 1983." *Id*.

In *Griffin*, the defendant city argued that it could not be liable for the city manager's rape of another employee because the rape occurred while the city manager was off-duty and on private property. The Eleventh Circuit rejected such a blanket position, holding that "whether a government employee is acting under color of law is not always an easy call, and the color of law analysis inevitably requires that we engage in line drawing. It is only through a process of 'sifting facts and weighing circumstances' that [the court] arrives at a correct determination." *Id*. Other courts have also found that state employees were acting within the scope of their employment, even when the misconduct took place outside of official working hours and not on the premises of

the public employment. *See, e.g., Hackett v. Fulton County School Dist*., 238 F. Supp.2d 1330 (N.D. Ga. 2002); *Johnson v. Cannon*, 947 F. Supp. 1567 (M.D. Fla. 1996).

Other cases have held that a state employee acts under color of law when he utilizes his authority to create the opportunity to facilitate a rape or sexual assault. *See Vang v. Toyed*, 944 F.2d 476, 479-80 (9th Cir. 1991) (employee of state employment agency acted under color of law when he raped women looking for employment while meeting with them under pretext of providing employment services). In *Rogers v. City of Little Rock, Arkansas*, 152 F.3d 790, 798 (1998), the Eighth Circuit held that a police officer acted under color of state law for purposes of § 1983 when, after making a traffic stop, he followed the woman home and raped her. The court looked at the fact that the officer had stopped the woman for a broken tail light, threatened her with towing her vehicle when she was unable to produce proof of insurance, and remained in uniform during the events in question. *Id*.

In *Griffin*, the Eleventh Circuit cited a series of cases where the performance of a state actor's official duties "merely facilitated the meeting of or development of a relationship between the state actor and another person; and the state actor later, on his own time and wholly independent of his official duties, commits an assault or other constitutional tort against that person" and, in those circumstances, "the law is clear that the state actor is not acting under color of law." *Id*. at 1306-07 (citing *Roe v. Humke*, 128 F.3d 1213 (8th Cir. 1997); *Becerra v. Asher*, 105 F.3d 1042, 1047 (5th Cir. 1997); *D.T. v. Independent School District*, 894 F.2d 1176, 1186-88 (10th Cir. 1990)).

In this case, Doe met Mann through her boyfriend and her church, not through his police work. There is testimony that Doe and Mann had sexual relations while Mann was on duty, and

that they had sex in his unmarked police vehicle.  Mann would often pick Doe up from school in that vehicle and then have sex with her either in the car or at a motel.  Doe testified that Mann never threatened to arrest her if she didn't have sex with him. (Doe Depo. at 30).  However, in her affidavit, Doe states that her "fear" of Mann kept her from being truthful with authorities when the affair was initially discovered. (Doe Aff. at 2).  Doe states that "in light of Detective Mann's job, [she] did not know who to trust."  (Doe Aff. at 2).  Doe also confirms her parents' testimony that Mann threatened them with repercussions if they reported the affair. (Doe Aff. at 2).  In sum, the connections that Plaintiff alleges between Mann's occupation and her injury are that: (1) Doe and her family trusted Mann more because he was a police officer; (2) Mann threatened Doe and her family with "getting in trouble" if they reported him; (3) Mann had sex with Doe while he was on-duty and in his official police vehicle and (4) Mann's job as a sex-crimes detective triggered repressed psychological trauma in Mann which caused him to prey on Doe.

There are no cases directly on point in the Eleventh Circuit, however, it is clear that the inquiry as to whether someone is acting "under the color of state law" is a fact-intensive inquiry to be handled on a case by case basis.  Generally, the mere fact that a defendant's position as a government official leads people to trust him is not sufficient to establish a claim under § 1983. *See, generally, D.T.,* 894 F.2d 1176; *Becerra*, 105 F.3d 1042.  Furthermore, the trend in all the cases discussed above, is that the defendant must be abusing the power granted to him by the state in order to violate someone's rights.  It is clear that, with regard to the first sexual encounter, Mann was not acting under the color of state law.  Therefore, the only argument that could be successful is that Mann used his authority to create opportunities to continue having sex with Doe.

In *Griffin*, the Eleventh Circuit found that the city manager, Neal, was acting under the color of state law, in part because he used his position and authority to get the victim alone in his car. The victim had arranged for a ride home with the police chief but "Neal intervened and invoked his authority as City Manager to create the opportunity to be alone with Griffin, to take her home, and then to rape her." *Griffin,* 261 F.3d at 1304. The Eleventh Circuit reasoned that, even though the assault occurred on private property after work hours, Neal was acting under color of law because he used his authority to create the opportunity to rape Griffin and he had previously used his authority to sexually harass Griffin for a significant period of time leading up the assault. *Id.* at 1305.

In the instant case, Mann often had sex with Doe will he was on-duty and in his city-owned vehicle. While Mann's position as a law enforcement officer did not facilitate his meeting Doe, the facts do support a reasonable inference that it facilitated his continued ability to assault her. There remain material questions of fact such as whether Mann made threats against Doe and her family, whether Mann acted under color of state law when making such threats, and whether those threats led to the violation of Doe's constitutional rights. Therefore, this Court cannot conclude that, as a matter of law, Mann was not acting under the color of state law for purposes of § 1983.

### 2. Custom and/or Policy

The City also argues that Plaintiff has failed to demonstrate a custom or policy that was the moving force behind the violation of her constitutional rights. The City correctly asserts that the doctrine of *respondeat superior* does not apply to claims arising under § 1983. *Engelleiter v. Brevard County Sheriff's Dept.,* 290 F. Supp. 2d 1300, 1308 (M.D. Fla. 2003). Instead, municipal liability under § 1983 may be established by evidence that:

> (1) the constitutional deprivation was caused by a policy or custom of the local governmental entity, or (2), the final policymakers of the local governmental entity acted with deliberate indifference to a constitutional deprivation, or (3) the final policymakers of the local governmental entity delegated their authority to a subordinate who, in turn, caused a constitutional deprivation, or (4) the final policymakers of the local governmental entity ratified a constitutionally impermissible decision or recommendation of a subordinate employee.

*Sherrod v. Palm Beach County School District,* 424 F. Supp. 2d 1341, 1344 (S.D.Fla. 2006).

In this case, Doe argues that the City's final policymakers were deliberately indifferent in their hiring, supervision and retention of Mann. "[D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley,* 182 F.3d 1248, 1255 (11th Cir. 1999).

Doe also alleges that OPD had a custom or policy of perpetuating a "code of silence" among its officers. "To establish a policy or custom, Plaintiff normally must show a persistent and widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Engelleiter*, 290 F. Supp. 2d at 1309.

For the reasons discussed below, Plaintiff has failed to present sufficient evidence to support municipal liability under § 1983, and therefore, this Court must grant summary judgment to the City with regard to Count II.

    *a) Hiring*

Plaintiff alleges that OPD failed to conduct appropriate psychological evaluations of Mann both at the time he was hired and when he was promoted to the sex crimes unit. However, Plaintiff's own experts indicate that Mann's post-traumatic stress disorder would have been dormant at both of those times. Even if Mann had been given thorough psychological evaluations

at both times, and the City had become aware of his past victimization, Plaintiff has not presented any evidence that this would have resulted in a different hiring or promotion decision. Furthermore, even if it would have, one bad hiring decision does not necessarily create municipal liability.

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference.

*Bryan County v. Brown,* 520 U.S. 397, 412 (1997).

In this case, there is no evidence that awareness of Mann's past sexual abuse would lead to an obvious conclusion that the result of hiring him would be the deprivation of someone's constitutional rights. (See O'Dell Depo. At 23). Past victimization does not necessarily indicate future sexual misconduct. (See Greico Depo at 21, 26 and 30; Chacko Depo. at 38). Dr. Alan Greico testified that approximately one in ten men and one in three women have been victims of sexual abuse. (Greico Depo. at 30). Certainly these individuals cannot be automatically disqualified from becoming detectives, even in a sex crimes unit. In fact, an individual who has been victimized may be uniquely qualified to investigate such crimes. (See, e.g., Cosgrove Depo. at 37). In this case, Mann had no past record of committing sex crimes and there was no reason for OPD to be suspicious of his ability to be a sex crimes detective. Even Plaintiff concedes that at the time Mann was hired and promoted he was not prone to committing such crimes. Instead, Plaintiff argues that Mann's job requirements awakened a dormant case of post-traumatic stress disorder and turned him into a predator. (See Chacko Depo. at 22; Greico Depo. at 16-17, 18 and 23). However, even if it is true that Mann's work in the sex crimes unit inspired or motivated him

to have sex with Doe, there is simply no evidence that the City was deliberately indifferent to the violation of constitutional rights either at the time of hiring or promoting Mann.

### *b) Supervision*

Plaintiff next argues that the City failed to supervise Mann, and because of that he was able to have sex with Doe while he was on duty and in his police car. However, there is no indication that the City was deliberately indifferent in its failure to supervise Mann. It is the nature of police work that officers spend much of their time away from the office. The City had no way of knowing that Mann was having sex with Doe while on duty, and had no indication that closer supervision was required. Plaintiff has not presented any evidence that this lack of direct supervision of detectives is unusual among law enforcement agencies. The only testimony in this regard is by Dr. Hibler who notes that he is aware that the FBI looks at pager and cell phone records of its agents during investigations. (Hibler Depo. at 60-61). This, however, is not relevant in this case as Mann was not being investigated either prior to or during his relationship with Doe.

### *c) Retention*

With regard to retention, there is no evidence that the City's final policymakers had any knowledge of Mann's misconduct until April of 2001. Furthermore, the evidence indicates that Mann was arrested and sent for a psychological evaluation almost immediately after his relationship with Doe came to light. Shortly thereafter Mann resigned from the OPD. Therefore, Plaintiff has not shown any evidence of deliberate indifference with regard to retention of Mann.

### *d) Code of Silence*

Finally, Plaintiff argues that the City should be liable because of a "code of silence" that exists among its officers. However, the only evidence that Plaintiff presents to support this theory

is that Mann told Officer Ken McPhereson ("McPhereson") about his sexual misconduct and McPhereson did not tell anybody about it. Yet, when Mann confessed to Duke, Duke immediately contacted the FDLE and reported Mann's behavior, which refutes the code of silence claim. Furthermore, Plaintiff presents no evidence that the City's final policymakers were aware of a code of silence within the OPD. Instead, Duke testified that a code of silence does not exist at OPD (Duke Depo. at 46-47), and McPhereson testified that if he thought Mann had committed a crime he would have reported it to internal affairs (McPhereson Depo. at 25, 27-28).

*B) Negligent hiring, supervision and retention claim*

To state a cause of action for negligent supervision or negligent hiring under Florida law Plaintiff must allege (1) the existence of a relationship giving rise to a legal duty to supervise; (2) negligent breach of that duty; (3) proximate causation of injury by virtue of the breach. *See Roberson v. Duval County School Board*, 618 So.2d 360 (Fla. 1st DCA 1993). The primary distinction between a claim for negligent hiring and a claim for negligent supervision or retention depends on the time at which the employer has knowledge of the employee's unfitness. *See Malicki v. Doe*, 814 So.2d 347, 362 (Fla. 2002). A claim for negligent hiring arises when, before the time the employee is hired, the employer knew or should have known that the employee was unfit; liability for negligent supervision or retention occurs after employment begins, where the employer knows or should know of an employee's unfitness and fails to take further action such as "investigating, discharge or reassignment." *Id.*

Plaintiff has alleged that the City negligently placed Mann in the position of sex crimes investigator and trained him in the methods and psyche of sexual predators, when the City knew or should have known of Defendant Mann's own history of sexual abuse. Assuming that the City did

owe a duty to Plaintiff, Plaintiff has failed to present evidence that the City negligently breached that duty.

Again, the Plaintiff criticizes OPD for failing to conduct a full psychological evaluation of Mann at the time he was hired and before he was transferred to the sex crimes unit.  Plaintiff has not presented any evidence to support the argument that the City was unreasonable in failing to inquire into Mann's past sexual victimizations.  There is no testimony to indicate that it is below the acceptable standard of care for a local police department to fail to make such inquiries either at the time of initial hiring or promotion into a sex crimes division.  The only testimony presented by Plaintiff on this issue is that of Dr. Chacko, who stated that the psychological evaluation conducted when Mann was hired was incomplete because he was not asked about past victimizations. (Chacko Depo. at 32-33).  However, Chacko also testified that he did not know if conducting psychological evaluations was typical of law enforcement agencies. (Chacko Depo. at 23-24).  Additionally, there is no evidence that Mann's past abuse rendered him "unfit" for duty.

Furthermore, as discussed above, Plaintiff has not presented any evidence that a reasonable municipality would supervise its detectives any differently than the City did in this case, even if the City had been aware of Mann's past victimizations.  Therefore, Plaintiff has presented no evidence that the City breached any duty with regard to the hiring, retention or supervision of Mann and summary judgment is appropriate with regard to Count V as well.

**IV. Conclusion**

Accordingly, it is

**ORDERED** that the City of Orlando's Motion for Summary Judgment (Doc. 94) is **GRANTED**. The City of Orlando is hereby **DISMISSED** from this case.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 22, 2007.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party